UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

_____
                                                    )
UNITED STATES OF AMERICA,          )
                                                    )
v.                                                   )        Criminal No. 3:16-CR-00198 (AWT)
                                                    )
JARED DYLAN SPARKS,                   )
JAY WILLIAMS                               )
_____ )

**DEFENDANTS' MOTION TO COMPEL PRODUCTION OF THE PROSECUTION
TEAM'S NOTES, REPORTS, AND INFORMATION BASED ON *BRADY, GIGLIO*, AND
DISCOVERY VIOLATIONS AND INCORPORATED MEMORANDUM OF LAW**

Defendants Jared Dylan Sparks and Jay Williams respectfully move for discovery of, inter

alia, agent notes, reports of interviews, and email communications with members of the

prosecution team and witnesses, for the reasons set forth below.

## I.        GENERAL PRINCIPLES OF LAW

"The prosecutor is an officer of the court whose duty is to present a forceful and truthful

case to the jury, not to win at any cost." *Drake v. Portuondo*, 553 F.3d 230, 240 (2d Cir. 2009),

citing *Jenkins v. Artuz,* 294 F.3d 284, 296 n. 2 (2d Cir.2002) (noting the duty of prosecutors under

New York law "to seek justice, not merely to convict").   To level the playing field, prosecutors

must timely satisfy its discovery and evidentiary obligations, as required by Fed.R.Evid.16, the

local Standing Order on Pretrial Discovery, the policies of the United States Attorney's Office for

the District of Connecticut, the Jencks Act, and the Fifth, Sixth, and Fourteenth Amendments to

the U.S. Constitution. Fed.R.Crim.P. 16; *Exhibit 1* (USAO policy); 18 U.S.C. § 3500; *Giglio v.

United States*, 405 U.S. 150 (1972); *Brady v. Maryland*, 373 U.S. 83 (1963).

**Fed.R.Crim.P. 16.** Rule 16(a)(1)(E) requires the prosecution to produce

1

books, papers, documents, data, photographs, tangible objects, buildings or places, or copies or portions of any of these items, if the item is within the government's possession, custody, or control and:

(i) the item is material to preparing the defense;

(ii) the government intends to use the item in its case-in-chief at trial; or

(iii) the item was obtained from or belongs to the defendant.

Evidence is material to the preparation of a defense within Rule 16 if "'it could be used to counter the government's case or to bolster a defense,'" *United States v. Reddy*, 190 F. Supp. 2d 558, 572 (S.D.N.Y. 2002), whether or not the prosecution intends to offer the evidence at trial, *United States v. Stevens*, 985 F.2d 1175, 1180 (2d Cir. 1993). The Rule "is not limited to evidence that is favorable or helpful to the defense and does not immunize inculpatory evidence from disclosure. Inculpatory evidence, after all, is just as likely to assist in the preparation of the defendant's defense' as exculpatory evidence" and "is just as important to the preparation of a defense to know its potential pitfalls as to know its strengths." *United States v. Safavian*, 233 F.R.D. 12, 15 (D.D.C. 2005), quoting from *United States v. Marshall,* 132 F.3d 63, 67 (D.C. Cir. 1998).

In this District, rough notes from interviews of a defendant are discoverable under Rule 16. See *United States v. Jacobs*, 650 F. Supp. 2d 160, 168 (D. Conn. 2009); *United States v. Ionia Mgmt. S.A.,* No. 3:07–cr–134(JBA), 2007 WL 2298570, *1–2 (D.Conn. Aug. 3, 2007) (Arterton, J.); *United States v. Ferguson,* 478 F.Supp.2d 220, 235–37 (D.Conn.2007) (Droney, J.); (conducting a similar analysis, citing *Ferguson,* and ordering disclosure of such notes).

**Brady and Giglio.** The Supreme Court held in *Brady v. Maryland* "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of

the prosecution." 373 U.S. at 87. The disclosure duty applies to impeachment evidence as well as exculpatory evidence. *Giglio v. United States,* 405 U.S. at 154; *United States v. Coppa,* 267 F.3d 132, 139 (2d Cir.2001).  Also, *Brady* is not limited to just admissible evidence.  "The objectives of fairness to the defendant, as well as the legal system's objective of convicting the guilty rather than the innocent, require that the prosecution make the defense aware of material information potentially leading to admissible evidence favorable to the defense." *United States v. Rodriguez,* 496 F.3d 221, 226 (2d Cir. 2007). See also *United States v. Gil,* 297 F.3d 93 (2d Cir.2002).

The duty to disclose derives from "the special role played by the American prosecutor in the search for truth in criminal trials. Within the federal system, for example, we have said that the United States Attorney is "the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done." *Berger v. United States,* 295 U.S. 78, 88 (1935).

A prosecutor is presumed to know **all** information and evidence gathered during the investigation, and she "has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case." *Kyles v. Whitley,* 514 U.S. at 437.  Her duty to disclose exculpatory or impeachment evidence is automatic; there need not be a request.  *United States v. Agurs,* 427 U.S. 97, 107 (1976).  Disclosure must be made "no later than the point at which a reasonable probability will exist that the outcome would have been different if an earlier disclosure had been made." *United States v. Certified Envtl. Servs., Inc.*, 753 F.3d 72, 92 (2d Cir. 2014), quoting from C*oppa,* 267 F.3d at 142.  Where there is doubt, prosecutions should err in favor of disclosure.  See *Kyles v. Whitley,* 514 U.S. at 439; *Agurs,* 427 U.S. at 108.  Whether the

prosecution acted in good or bad faith is irrelevant for *Brady* and *Giglio* purposes. *United States v. Bagley,* 473 U.S. 667, 676

The time at which a *Brady/Giglio* violation is discovered is important to the Court's analysis. If, like in this case, a violation is brought to the court's attention before or **during** trial, evidence is material and thus must be turned over if it is "favorable" to the defense.[1] *United States v. Safavian*, 233 F.R.D. 12, 16 (D.D.C. 2005). Before or during trial, "[t]he prosecutor cannot be permitted to look at the case pretrial through the end of the telescope an appellate court would use post-trial. Thus, the government *must always* produce any potentially exculpatory or otherwise favorable evidence without regard to how the withholding of such evidence might be viewed-with the benefit of hindsight-as affecting the outcome of the trial." *Id.* Thus, when a *Brady/Giglio* issue comes to light before or during trial, evidence "must be disclosed without regard to whether the failure to disclose it likely would affect the outcome of the upcoming trial." *Id.* The typical remedy is a mistrial, but where the violation(s) is particularly egregious, dismissal pursuant to the Court's inherent supervisory powers may be warranted. See *Giglio*, 405 U.S. at 153; *United States v. Hogan,* 712 F.2d 757, 761 (2d Cir.1983). See also *United States v. Wang*, 98-cr-199(DAB), 1999 WL 138930, *3 (S.D.N.Y. 1999) (dismissing indictment for due process violation where prosecution failed to provide "material information" until "eve of trial," thus making key witness unavailable).

---

[1] "The meaning of the term 'favorable' under *Brady* is not difficult to discern. It is any information in the possession of the government-broadly defined to include all Executive Branch agencies-that relates to guilt or punishment and that tends to help the defense by either bolstering the defense case or impeaching potential prosecution witnesses." *Safavian*, 233 F.R.D. at 16. "The government is obligated to disclose all favorable evidence that is itself admissible or "that is likely to lead to favorable evidence that would be admissible or that could be used to impeach a prosecution witness." *Id.* at 17.

When *Brady/Giglio* violations are raised for the first time **after** trial, the analysis is retrospective, and so a defendant must demonstrate that (1) the evidence at issue is exculpatory or impeaching; (2) the evidence was suppressed, in whole or by untimely disclosure; and (3) the defendant was prejudiced. *Strickler v. Greene,* 527 U.S. 263, 281–82 (1999).  On the latter prong, "'[t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence.'" *Leka v. Portuondo,* 257 F.3d 89, 104 (2d Cir.2001) (quoting *Kyles v. Whitley,* 514 U.S. 419, 434 (1995)) (alterations omitted, emphasis added). See also *Cone v. Bell,* 556 U.S. 449, 469–470 (2009). Put another way, "a defendant does not need to show that the evidence, if disclosed, would have resulted in his acquittal; rather, he needs to show only that the evidence `could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'" *United States v. Schwarz,* 259 F.3d 59, 64 (2d Cir. 2001), quoting from *Kyles v. Whitley*, 514 U.S. at 434–35.

**Jencks**.    Under the Jencks Act, the prosecution must produce to the defendant any "statement" by testifying prosecution witnesses which "relates to the subject matter as to which the witness has testified." 18 U.S.C. § 3500(b); *see id.* § 3500(e) (defining "statement"). The Act pertains only to statements which have been memorialized in some fashion, but even when not memorialized, a prosecutor is still required to disclose if the statement is exculpatory or impeaching. In other words, ***Brady/Giglio* obligations trump Jencks**. *United States v. Rodriguez*, 496 F.3d 221, 225–26 (2d Cir. 2007).  See also *United States v. Vilar,* No. 05–cr–621(RJS), 2008 WL 2531195, *1 (S.D.N.Y. June 22, 2008) (collecting Second Circuit cases).

**Local Standing Order.**  The District of Connecticut Standing Order on Discovery, as amended on May 24, 2017, requires prosecutors to disclose *Brady/Giglio* material within fourteen

(14) days of arraignment.  While this timing may not be "constitutionally compelled," the Standing Order's requirements are "based on the Court's inherent power to manage its docket and provide for the orderly and timely disposition of cases."  *United States v. Jacobs*, 650 F. Supp. 2d 160, 165 (D. Conn. 2009)(Haight, J.), quoting from *United States v. Perez,* 222 F.Supp.2d 164, 171 (D.Conn.2002)(Arterton, J.).

**Policy of the US Attorney's Office.**  The United States Attorney's Office for the District of Connecticut (USAO) has a detailed written policy to govern prosecutor's discovery decisions. *Exhibit 1.*  The policy provides in pertinent part:

- Case agents should not have substantive communication with witnesses via email, *Exhibit 1* at 6 (last para.);

- Prosecutors must obtain and review any emails between agents and witnesses, *id.;*

- Prosecutors must ensure that after "any meeting with a witness, including, but not limited to, when preparing for grand jury, trial or any other hearing, the attending agent … prepares a report of interview that memorializes any newly disclosed, inconsistent or exculpatory information obtained during such meeting," or, "[i]f a report will not be prepared in time to make a timely disclosure of the new information to enable the defense to utilize the information to prepare for trial, then Assistants need to provide the information to defense counsel by letter or email message," *id.* at 11 (emphasis added);

- Prosecutors must turn over "information that is **inconsistent** with any element of any crime charged against the defendant or that establishes a recognized affirmative defense, **regardless of whether the prosecutor believes such information will make the difference between conviction and acquittal,**" *id.* at 7 (1st para.) (emphasis in original);

- Prosecutors must disclose "information that either **casts a substantial doubt upon the accuracy** of any evidence – including but not limited to witness testimony – the prosecutor intends to rely on to prove an element of any crime charged, or might have a significant bearing on the admissibility of prosecution evidence," *id.* (emphasis in original);

- When interviewing witnesses, prosecutors must focus on obtaining accurate information and "not thinking of ways to make it difficult for defense counsel to cross-examine, e.g., deciding not to take notes or not

to have a report prepared to prevent [a prosecution] witness from being impeached by defense counsel," *id.* at 10, ¶ (g)(1);

- When interviewing witnesses, a prosecutor must ensure that an agent is present, *id.* at 11, ¶ (g)(3);

- Prosecutors must "disclose memoranda of interviews (FBI 302s, DEA 6s, IRA ROIs, etc.) of testifying witnesses, *id.* at 8 (2nd full para.);

- Prosecutors must disclose Jencks materials five days before the start of evidence, *id.* at 8 (3rd full para.);

- Prosecutors must preserve their notes, *id.*, ¶(g)(4);

- Prosecutors should designate an agent to be the primary notetaker at each witness interview, who "should be directed to create a report of that interview in a timely manner – that is, shortly after the interview takes place," *id.* at 12, ¶ (h)(1); and

- Prosecutors must disclose interviews of non-testifying witnesses which contain exculpatory or impeachment evidence, *id.* (4th full para.).

This policy, which the defense quoted in court during trial, is dated October 15, 2010.  That policy remained in force until at least April, 2015.  See https://www.justice.gov/usao/resources/foia-library/public-usao-criminal-discovery-policies (last posted on April 3, 2015; last accessed on July 22, 2018). In a letter dated July 11, 2018, AUSA's Rodriguez-Coss and Smith represented: "We have also complied with our current Office Policy and will show that the U.S. Attorney's Office Policy quoted by the defense to the Court during trial was no longer in effect, was quoted out of context, and did not stand for the proposition argued by defense counsel."  *Exhibit 3*. Despite the defense's explicit request, the prosecution has failed to provide a copy of any purportedly new office policy.

Courts may fairly and properly consider whether a prosecutor violated office policy or district custom.  *See, e.g., United States v. Espinal*, 96 F. Supp. 3d 53, 66 (S.D.N.Y. 2015).  Court may also, but are not required to, consider that a prosecutor affirmatively states she is aware or,

and complied with, her Brady and other obligations.  See *United States v. Jacobs,* 650 F. Supp. 2d 160, 166–67 (D. Conn. 2009)(Haight, J.); *United States v. Calhelha,* 456 F.Supp.2d 350, 369 (D.Conn.2006) (Arterton, J.).  Due to the number of violations described in this memorandum and as will be revealed at the upcoming evidentiary hearing, the defense suggests that any such assertions in this case should not be credited. Indeed, when asked about her compliance with the office policy, AUSA Rodriguez-Coss remarked, "Your Honor, what the defense is quoting is a policy of the United States Attorney's Office. That's not the Jencks Act." *Exhibit 2.*

## II.     ARGUMENT

### A.  The Defense Is Entitled To Discovery On The *Brady/Giglio* Violations.

To obtain discovery, Sparks must make a *prima facie* showing that *Brady/Giglio*/discovery violations occurred. *See United States v. Maniktala,* 934 F.2d 25, 28 (2d Cir.1991) (citing *United States v. Buckley,* 586 F.2d 498, 506 (5th Cir.1978), *cert. denied,* 440 U.S. 982 (1979)); *United States v. McGuinness,* 764 F.Supp. 888, 894 (S.D.N.Y.1991).  The defense has already met that burden.Shortly after the jury retired to deliberate, the Court explicitly stated on the record that the defense had met their *prima facie* burden of showing that the prosecution team had violated Brady and Giglio.  On that basis, the Court declined to accept AUSA Rodriguez-Coss's offer to provide the Court with Mehring's notes of interviews for *in camera* review.  *Exhibit 6.*

Illustrative (but not exhaustive) examples of discovery, *Brady, Giglio*, and Jencks violations are set forth below.

### 1.  The Prosecution Failed to Produce Interview Reports For Several Government Witnesses.

DCIS S/A Christopher Mehring was the lead investigator and author of every interview report turned over to the defense, except for two (2) FBI 302 reports, which are addressed below.

Before trial, the prosecution the following interview reports, each written by Mehring:

- Seventeen (17) reports for **Peter Legnos**, dated July 3, 2012; November 6, 2012; February 27, 2013; April 30, 2013; July 26, 2013; August 6, 2013[2]; August 27, 2013; April 30, 2014; May 13, 2014[3]; October 17, 2014; October 24, 2014; February 24, 2016; July 7, 2016; August 8, 2016; and August 8, 2016;

- Two (2) reports for **Francine Brodeur**, dated July 3 and November 6, 2012;

- Two (2) reports for **David Mittelman**, dated September 13, 2012 and August 9, 2013;

- One (1) report for **Dr. Daniel Deitz**, dated May 3, 2013**;**

- One (1) report for **Susan Paolini**, dated May 3, 2013;

- One (1) report for **Nicholas Vassallo**, who did not testify, dated May 3, 2013;

- One (1) report for **Courtney Murphy**, who did not testify, dated February 21, 2013;

- One (1) report for **Jim Baker**, who did not testify, dated February 19, 2016;

- One (1) report for **Nikhil Saralkar**, who did not testify, dated September 28, 2016;

- Two (2) interview reports of **Jay Williams**;

- One (1) interview report of **Jared Dylan Sparks**;

- One (1) report for **Charles Lohr**, who testified as a defense witness, dated June 1, 2018;

- One (1) report for **Pablo Clemente-Colon,** dated June 10, 2014;

- One (1) report for **Bob Tuneski**, dated June 25, 2013; and

- One (1) report for **Areece Peak**, dated February 18, 2016.

---

[2] This report is of a joint interview of Legnos and a former LBI employee, Jim Rosenberg.
[3] This report is of a joint interview of Legnos and former LBI engineer Nicholas Vassallo.

The prosecution failed to produce **any** interview or other reports for the following nine (9) people who either testified or were disclosed as witnesses before trial:

(1) **Richard Buser**, formerly of LBI;

(2) **Kevin Spark**, Dropbox in-house counsel;

(3) **Kevin Li**, formerly of Dropbox, who told Mehring there were no shared folders for Sparks' Dropbox account and other exculpatory information;

(4) **Sean Tuttle** of Stoneturn Group, whom the prosecution directed to create certain files and exhibits regarding the 2012 forensic wiping of Sparks' personal laptop, external device, and personal Gmail and Dropbox accounts;

(5) **Daniel Dvorak**, who created the first forensic images of Sparks and Williams' LBI computers, which Mehring inexplicably refused to accept;

(6) **Dr. Frank Herr**, formerly of ONR and Dr. Deitz's former boss;

(7) **Gary Davis** of SPAWAR;

(8) **Matthew Jewel**, formerly of LBI; and

(9) **Allen Flick**, formerly of Metron.

Upon the Court's explicit order, the prosecution turned over agent notes for Buser and Flick during trial. *Exhibits 4 and 5*. The Buser notes, however, were not disclosed, however, until after Buser had completed his direct examination.  Also, the prosecution turned over three short, one paragraph reports for Mittelman, Buser, and Kevin Spark.

At a minimum, the failure to turn over interview reports for these nine individuals violates the U.S. Attorney Office's policy on discovery, which requires prosecutors to  *See Exhibit 1 at 11.*

**2.  The prosecution suppressed all but two (2) FBI 302 reports.**

FBI S/A Greg Stroh was present for all or nearly all witness interviews.   Another FBI

agent conducted at least one interview.  The prosecution, however, has **only two (2) FBI 302 reports:**  one for Charles Lohrs, a former LBI employee who testified as a defense witness but whose name also appeared on the prosecution's witness list, and a one-paragraph report produced during trial.

### 3.  Known Violations Regarding David Mittelman

The case against Sparks rises and falls upon whether he used his personal Dropbox account to steal LBI's purported trade secrets.  Going into trial, the defense knew that David Mittelman, a former LBI software engineer who often used Sparks' former LBI desktop computer, would be an essential witness to the prosecution, in that he was the person who purportedly found an installed Dropbox application on the LBI desktop formerly used by Sparks.

Before trial, the prosecution disclosed two interview reports regarding Mittelman. According to the first, dated November 13, 2012, Mittelman began working part-time for LBI on November 11, 2011.  He worked two (2) days a week at LBI and otherwise, while attending college at the University of Connecticut.  Mittelman reported using Sparks' former LBI desktop, and *inter alia,* that

> in approximately February of 2012, he went to the `My Documents' folder … and found a folder named `Dropbox," in the exact location that Mittelman knows is the default installation location for the Dropbox software.  Mittelman said he immediately knew that there was a problem because he personally uses Dropbox services directly from his cellular telephone.

*Exhibit 6.*

The report further states that, according to Mittelman, "there is no good reason for using the Dropbox software in a secure setting. *Id.* at 4. The report is entirely silent as to whether or how Mittelman used Dropbox for his work at LBI.  See *id.*

According to the second interview report, dated August 12, 2013, Mittelman told Mehring

during a telephone interview that he had used Dropbox to transfer information from his personal devices to LBI, but that he "does not recall ever transferring any files TO his Dropbox account from LBI, but was not positive." *Exhibit 7*. Mittelman further said that "any LBI data that was retained in [his] Dropbox account was deleted immediately after the file transfer." *Id*.

Based upon these two reports, Sparks formulated a defense strategy where he planned to impeach Mittelman's credibility, to cast doubt on his claims regarding his discovery of Dropbox on Sparks' former computer. Despite Mittelman's presence in the District for nearly a week and multiple interviews in the days before his testimony, the only other information about Mittelman disclosed to the defense is a report which states in its entirety:

> On June 18, 2018, the reporting Agent [Mehring] met with David Mittelman in preparation for trial. During the discussion, Mittelman was asked whether or not he had ever uploaded any information to Dropbox containing LBI information. **Mittelman logged into his account to refresh his recollection and located a file believed to contain information belonging to LBI concerning work that he had completed on the underwater glider project**. Mittelman stated that he had forgotten that he still had information in his Dropbox account. Based upon the file name and the date that it was uploaded to his account in June of 2012, Mittelman said that **he believes that he had sent a copy to Matt Jewel at his request via Dropbox**, because Mittelman was relocating from Connecticut on that date. Mittelman said that he did not locate any other materials in his Dropbox believed to belong to LBI. **Mittelman also located his timesheets while at LBI in his Dropbox account.**

*Exhibit 8* (emphasis added).

While Mehring's June 18 report seems on its face to be a disclosure of *new* information, cross-examination of the prosecution's forensic computer analyst expert revealed that **Mehring had already known for more than six (6) months** that Mittelman accessed his person Dropbox account by logging onto his account from www.dropbox.com, and that **Mittelman had done so from the exact same desktop computer** previously assigned to Sparks, from where the November 7, 2011 upload to Spark's account had originated. *Exhibit 9 at 27-29*. The prosecution, however,

suppressed this highly exculpatory information, thereby preventing Sparks from timely seeking a Rule 17(c) subpoena for Mittelman's Dropbox activity and from timely investigating whether other LBI employees used Dropbox in a similar manner.  The late disclosure also deprived Sparks of the ability to effectively prepare a defense for trial, a highly prejudicial result of the prosecution's *Brady/Giglio* violations given the importance of Dropbox to this case.

Sparks anticipates that the prosecution will declare that he was not prejudiced because his own forensic computer analyst uncovered some evidence of Mittelman's Dropbox usage and because the defense investigator was able to interview him.  See, e.g., *United States v. Orena,* 145 F.3d 551, 558 n. 4 (2d Cir.1998)(evidence is not "suppressed" when defendant knew or should have known of essential facts permitting him to take advantage of the evidence). Neither claim would withstand scrutiny.

Regarding the defense expert, had the prosecution been honest and forthcoming about Mittelman, the defense would not have undertaken the expense or time of investigating Mittelman's Dropbox usage; those valuable resources could have been used for other avenues.  In any event, the defense (and their expert) had no way of knowing the extent of Mittelman's Dropbox usage; the purposes for which he used Dropbox; the contents of his Dropbox account; that Mittelman routinely used his personal Dropbox account for personal business; that Mittelman uploaded and/or downloaded LBI proprietary information on a routine basis; or that at the time of trial (and at least five (5) years since his own departure from LBI), Mittelman continued to possess LBI proprietary information in his Dropbox account.   And the defense certainly had no reason whatsoever to believe that the prosecution would obtain at least some information about Mittelman's Dropbox account.

Further, it was established through the testimony of Dropbox in house counsel Kevin Spark that the prosecution team had obtained the Dropbox log on June 19, yet the prosecution suppressed the log – and even its existence – until after 6:00 PM on June 20, during Mittelman's direct testimony and a mere fourteen (14) hours before the start of the trial day on which Mittelman testified.   Such a short period of time -- in the midst of trial and after Sparks's trial strategy was revealed -- was plainly insufficient for the defense to react to the startling revelations and to craft a last-minute strategy for dealing with the new information from a witness whom the defense had been planning to extensively impeach.   The extremely late timing of the disclosure regarding Mittelman's use of Dropbox for LBI proprietary information is tantamount to suppression.   See *Leka,* 257 F.3d at 100 (noting that *Brady* disclosures must be timed so that the defense has a sufficient opportunity to use them); *id.* at 101 ("When ... a disclosure is first made on the eve of trial, or when trial is under way, the opportunity to use it may be impaired"); *see also DiSimone v. Phillips,* 461 F.3d 181, 197 (2d Cir.2006) ("The more a piece of evidence is valuable and rich with potential leads, the less likely it will be that late disclosure provides the defense an 'opportunity for use.' " (quoting *Leka,* 257 F.3d at 103)).

The prosecution also obtained from Mittelman a purported "sampling" of Mittelman's emails from his Gmail account.   Of the few emails that were turned over, only one shows that Mittelman used his Gmail and Dropbox accounts to transmit LBI proprietary information. Notably, there is *not one shred of evidence that Sparks did the same,* yet Mehring testified that in his personal view, Mittelman did not do anything wrong regarding his Dropbox and Gmail usage. The defense has no way of knowing, however, what Mittelman disclosed to or showed the prosecution team about other emails.   As such, Sparks seeks copies of all emails and any other documents provided to the prosecution team by David Mittelman.

14

Although Sparks need not demonstrate bad faith, it is easily inferred here. Indeed, despite having had six years to do so, the prosecution team failed to ask Mittelman for access to his Dropbox account and/or email account until *after* the defense opening statement, at which time the prosecution team realized that Sparks had some idea about Mittelman's Dropbox use while present at LBI. Even then, the Dropbox activity log provided to the defense in the midst of trial covers only a short period of time and provides a limited amount of information about Mittelman's Dropbox activities.  For example, the prosecution could have asked Mittelman to consent to a search for the email addresses of people with whom he had shared Dropbox folders as well as shared Dropbox links. Even though the evidence plainly established that Mittelman had dozens upon dozens of shared folders and that he shared links to LBI information in his account, the log provided to the defense contains neither type of information. *Trial Transcript at 1253, 1294-1296; Def. Tr. Exhibits 453 and 456.*

Also, mere minutes before Mittelman took the stand, AUSA Rodriguez-Coss disclosed for the first time that Mittelman had been *discharged from the Navy for unspecified psychological reasons*. "When the reliability of a given witness may well be determinative of guilt or innocence, nondisclosure of evidence affecting credibility falls within the general rule of *Brady*." *United States v. Bagley*, 473 U.S. 667, 677 (1985).  Here, the last-minute timing coupled with a vague disclosure was clearly prejudicial. No experienced defense attorney would delve into this topic in front of a jury without having at least some indication of the circumstances or the nature and degree of Mittelman's mental condition(s), and the defense was rightly concerned about taking time away from the jury given the extremely slow pace of the prosecution's case, which, we note, ended up truncating the defense case in chief by a substantial margin. See *United States v. Rodriguez*, 496 F.3d 221, 227–28 (2d Cir. 2007)("It is not surprising that, despite having pressed for disclosure of

the specific lies, none of the defense lawyers ran the risk of asking Lopez what lies she had told. At least in some circumstances, a prosecutor's use of this approach to the discharge of a *Brady* disclosure obligation might well result in the defendant's never learning the nature of the exculpatory or impeaching material which gave rise to the disclosure obligation."); *Leka,* 257 F.3d at 103 ("The opportunity for use under *Brady* is the opportunity for a responsible lawyer to use the information with some degree of calculation and forethought. A responsible lawyer could not put [the potential witness] on the stand without essential groundwork.").

### 4.   Known Violations Regarding Richard Buser, Former LBI Engineer[4]

Richard Buser, a former LBI mechanical engineer who worked with Sparks and Williams, was a critical prosecution witness who testified one to two days **after** the defense put on the record that they would not be calling Michael Good, the defense maritime engineering expert. Importantly, in making this decision, the defense relied upon information produced by the prosecution team and the prosecution's lack of an engineering expert of its own.

Knowing that Defendants would have no expert testimony, and to make up for the lack of an engineering expert of their own, the prosecution team decided to use Buser to fulfill an essential role. This was critical to the prosecution's case, given Legnos's inability to use or effectively demonstrate how to engineer the components of the LDUUV and to use SolidWorks on his own.[5] Filling the void, and without any notice to the defense, the prosecution relied heavily upon Buser

---

[4] A transcript of Buser's testimony is not yet available.
[5] Earlier, Mehring testified on cross-examination that the prosecution had not consulted with any engineering experts before trial, but had "very recently" begun speaking to such an expert; the circumstances strongly suggest that this "expert" was Richard Buser.

to explain the engineering aspects of the LDUUV and to demonstrate the complexity of SolidWorks drawings and renderings.[6]

The **only** pretrial discovery about Buser consists of emails and "G-chats" between Buser and Sparks, in which **Buser was highly critical of and displayed great hostility toward Peter Legnos.**  In violation of Rule 16, the Standing Order, and USAO official policy, the prosecution provided **no** discovery which would even arguably suggest Buser's quasi-expert role, and because the defense had already waived calling Mike Good as the defense engineering expert before Buser took the stand, and it would be unable to respond in kind to expert-like testimony by Buser.

There are more violations regarding Buser: On cross-examination, the defense demonstrated that the **prosecution team had met with Buser multiple times** and that agents took notes during each meeting.  The first interview occurred just about a month prior to trial, when Mehring and Stroh showed up at Buser's home at 8:00 PM, unannounced, and unaccompanied by any prosecutor.  That meeting alone lasted three hours.

No government agent or lawyer had previously spoken to Buser and there is no evidence that they knew what he would say, yet AUSA Rodriguez-Coss withheld notes and information generated during the prosecution teams very first contact with Buser, claiming that she had sent agents to the unannounced interview with a list of questions. *Exhibit 10.* Despite the fact that no member of the prosecution team had ever spoken to Buser prior to the agents' unannounced visit, the top of each of the mere five (5) pages of notes from the first meeting are marked "Trial Prep." *Exhibit 4.*

---

[6] Other than Buser, the only live demonstration of SolidWorks was during Legnos's testimony, when Mehring manipulated on a computer screen an image of what appeared to be a very rough sketch of an LDUUV component. Buser, in contrast, showed the images in 3-D color, zooming in and out to show different features.

In the week or so before his testimony, Buser met with the prosecution team on several more occasions, including **once for a full eight (8) hour day**.  Despite all those interviews, the prosecution failed to disclose **anything** that Buser said.

Concerned about the lack of reports for this critical prosecution witness, the Court ordered the prosecution to turn over the notes of at least the first interview.  Those notes, totaling less than five (5) pages, contain a wealth of exculpatory information, including but not limited to the following:

- Legnos "did not necessarily get people in trouble for security violations," contradicting Legnos;

- LBI employees did not receive guidance on security;

- Buser had used his personal computer to access the LBI network so he could listen to music while he worked;

- In 2014, Metron terminated a job interview with Buser upon learning he had worked for LBI;

- Buser had asked Dr. Dan Deitz for a recommendation to help him find a new position;

- Buser was "not sure" if Dr. Deitz had "offered anything like a job w/ DS [Sparks} & JW [Williams];"

- Legnos was "tough to work for" and within a five (5) year period of time, more than seventy (70) LBI employees quit or were fired;

- Buser did not recall the LBI computers being "wiped," as prosecution witness Francine Brodeur accused Sparks of doing; and

- When Buser began at LBI, he was assigned a new user name, contrary to Brodeur insisting that the same generic usernames were recycled over and over again and Mittleman's insistence that the "Dylan2" username was assigned to him.

*Exhibit 7.*

### 5.   Known and Suspected Violations Regarding Dropbox Counsel Kevin Spark

One of the prosecution's witnesses was Kevin Spark, in house counsel at Dropbox, for whom no interview report was turned over.  Mr. Spark's testimony, and the lack of notice regarding what he was expected to say, is troubling for several reasons.

First, Mr. Spark did not authenticate either Defendant's actual Dropbox log.  He said only that the *first pages* of Sparks's and Williams' respective activity logs, as shown in Government Trial Exhibits 390 and 391, are "printouts from the file activity log[.]" *Trial Transcript at 1148.* Second, despite his limited review of the records, the prosecution attempted to question Mr. Spark about Defendant Sparks's log for November 7, 2011; Mr. Spark responded that he had only looked at the first page of the log.  *Id. at 1186.* Third, the full log of Sparks' Dropbox activity (Govt Trial Exh. 357) does **not** resemble Government Trial Exhibits 390 and 390, the only documents Mr. Spark identified as resembling Dropbox activity logs.

Finally, as the defense learned for the first time upon receipt of the second Jencks production, Dropbox did not retain copies of the materials produced in 2012 to Mehring pursuant to the search warrant.  As such, the business record certification admitted over objection as Government Exhibit 260 is accurate and reliable only if Mehring sent back to Dropbox an exact copy of what had been produced five to six years earlier.  For the reasons described in this memorandum and others, the defense is far from assured that is the case.

### 6.   Known Violations Regarding Susan Paolini, formerly of ONR

Before trial, AUSAs Jacabed Rodriguez-Coss and Kebharu Smith represented to Sparks' counsel that Susan Paolini, the former ONR contract officer who oversaw LBI's 0397 contract, would testify that **but for** Sparks and Williams going to CRA, Paolini would not have approved the expansion of CRA's contract 0405.  Thus, the prosecution represented, Sparks and Williams

are accountable for the defunding of LBI's 0397 contract.  During a defense interview, however, Paolini did not even recognize their names, and she did not testify consistently with the earlier representations, which were made to convince Sparks to plead guilty to a loss of over $2 million.

### 7.  Known and Suspected Violations Regarding Dr. Daniel Deitz

As the Court may recall, AUSA Rodriguez-Coss had agreed before trial to "make" Dr. Daniel Deitz "available" to the defense, in the event that the prosecution failed to call him as a witness. Backtracking from her word, it was later revealed that she had no such intention, despite the prosecution team's disinterest in Dr. Deitz as a prosecution witness, as would be revealed in the middle of trial.   As such, the defense had no choice but to comply with the Touhy regulations to obtain his testimony.  Here, that means that (1) ONR counsel explicitly forbid defense counsel from asking, and Dr. Deitz from testifying, about his opinions, ONR policy, and other matters; (2) defense counsel could interview Dr. Deitz only in the presence of ONR counsel; and (3) defense counsel had to write out their planned direct examination of Dr. Deitz for approval by ONR Counsel, who required entire questions and topics to be abandoned.

No such restrictions were placed on the prosecution team, who interviewed Deitz at least four (4) times for a total of at least twelve (12) hours.  The prosecution team, however, produced only one (1) interview report regarding Deitz – and it is from five (5) years ago.  Without any reports regarding the latter three (3) interviews, the defense had no way of knowing which documents the prosecution showed to Deitz, what he said about them, or even the true reason(s) for AUSA Rodriguez-Coss's deception as to Deitz's availability to the defense.   Only the contemporaneous agent notes or reports written therefrom can reveal the truth (assuming, of course, that they are accurate).

In one concrete example of how the defense was prejudiced by the suppression of

exculpatory information that the prosecution team no doubt obtained from Dr. Deitz, during trial, the defense learned for the first time that Deitz had been so disturbed by Legnos's aerial and physical surveillance of Sparks, Williams, CRA, and the LD-1/2 that he reported the matter for a defense security investigation. Only the prosecution team is able to access information regarding Dr. Deitz's referral and they are constitutionally obligated to obtain and timely disclose evidence regarding the referral and any ensuing investigation.  See *Kyles v. Whitley,* 514 U.S. at 437; *United States v. Brooks,* 966 F.2d at 1503 ("affirmative duty of inquiry"); *United States v. Beers,* 189 F.3d 1297, 1304 (10th Cir.1999); *United States v. Jennings,* 960 F.2d at 1490.  Defendants further note that the prosecution attempted to keep from the jury all evidence regarding Legnos's surveillance. *Dkt 245.*

Sparks anticipates that the prosecution will argue that there are no *Brady* violations regarding Dr. Deitz because the defense interviewed and called him as a witness.  See *United States v. Grossman*, 843 F.2d 78, 85 (2d Cir. 1988). In the circumstances of this case, however, the defense's limited access to Dr. Deitz is no substitute for timely disclosed reports.  See *United States v. Espinal,* 96 F. Supp. 3d 53, 68 (S.D.N.Y. 2015) ("The government has the ability to subpoena a witness and place him in the grand jury, where he must testify under oath. A defendant does not have that power, and knowing the identity of a witness is a far cry from knowing what he said, under oath, in the grand jury. Moreover, the witness may not be willing to speak to the defendant or defense counsel, and even if he is willing to talk, he may say something different from what he said in the grand jury. Merely providing the name of a witness who has said something exculpatory in the grand jury is not the equivalent of disclosing the exculpatory information.").

While the defense had access to some of Deitz's emails, they have no way of knowing whether the prosecution turned over all relevant emails or what criteria they used for disclosing some emails but not others.  Notably, however, Mehring seized the *entire* contents of Deitz's ONR email account – a revelation unknown to the defense prior to Mehring's cross-examination at trial. Moreover, due to the restrictions of the *Touhy* regulations and the limitations placed upon him by ONR Counsel, Dr. Deitz's testimony and utility as a defense witness was limited. He frequently halted in his direct examination, trying to stay within the declared bounds, and was unable to fully answer defense questions.  The jury likely viewed him, consequently, as lacking credibility in at least some areas. Even if the jury found him entirely credible, Dr. Deitz was not able to freely and fully testify about the matters critical to Sparks' and Williams' defenses.  Thus, Dr. Deitz was not nearly as helpful to the defense as he could have and should have been.[7]

 In sum, it can be reasonably inferred that the prosecution did not call Deitz and did not turn over any reports or notes of any post-2013 interviews because Deitz had nothing inculpatory to say about Sparks or Williams, and a wealth of exculpatory information about the real reasons ONR defunded LBI's 0397 contract.  Remarkably, the prosecution went so far as to filing a motion to keep the real reasons from the jury. Dkt. 244.

### 8.  Known Violations Regarding Mark Spencer

During the testimony of defense witness Mark Spencer, formerly of LBI, the defense saw members of the prosecution team reading from a distance a three to four-page single-spaced FBI report. Presumably, this is an interview report written after an FBI agent paid a visit to Spencer's

---

[7] Further, because the prosecution team waited so long to announce that they were not calling Dr. Deitz -- who, undeniably, is a critical witness to the events giving rise to the prosecution of both Defendants -- the defense's first opportunity to interview him arose during trial, when Mr. Williams' lead counsel flew down to Virginia for an hour-long interview, accompanied by ONR counsel.  In total, the defense was able to meet with Deitz for a total of less than three hours.

home and conducted an interview of approximately one and one-half (1.5) hours.  As Spencer

testified at trial, he told the agent – who took notes -- that LBI may have engaged in improper

billing under its ONR contracts and that LBI sold defective AXIB buoys meant to measure climate

change, despite Spencer's notice to Legnos that the temperature sensors were not working

properly.  Obviously, evidence of fraud and improper conduct by Legnos and LBI is highly

exculpatory, as it casts Legnos' credibility into grave doubt.[8]  As such, Sparks requests that the

Court order the prosecution to produce the FBI 302 report, agent notes, and any other previously

undisclosed evidence regarding his allegation.

Further, the Court may recall AUSA Rodriguez-Coss's cross-examination of Spencer,

where she accused him to stealing LBI's AXIB Buoy trade secrets and starting a buoy business

with Sparks and Williams.  Sparks suspects that the 302 report, or other information in the

prosecution's possession, custody, or control shows that this line of attack was entirely baseless

and lacking a good faith basis.  As such, Sparks requests that the Court order the prosecution to

produce any and all information regarding Spencer's purported buoy business.

### 9.  Known and Suspected Violations Regarding Sean Tuttle of Stoneturn Group.

The prosecution called Sean Tuttle of the Stoneturn Group, whom Sparks had hired to rid

his personal devices and accounts of LBI information.  Prior to Tuttle's testimony, and as Sparks

learned on the morning of Tuttle's testimony, the prosecution had directed Tuttle to, *inter alia*,

create at least one 150-page "index" of LBI files found on Sparks' devices, and to conduct a search

---

[8] While the defense learned of the fraudulent conduct during their interview of Spencer,
the defense has no way of knowing (1) whether the FBI or any other federal agency investigated
Spencer's serious allegations; (2) whether any promises, inducements, or rewards were extended
to Legnos to protect him from the allegations; or (3) whether anyone corroborated Spencer's
allegations.

for certain documents and activities that well exceeded the scope of Sparks' consent.   This index was produced to Sparks' counsel for the first time on the morning of Tuttle's testimony.

### 10. Known Violations Regarding Allen Flick, Former Metron Employee

As the Court may recall from trial, the prosecution team failed to produce even a single interview report for Allen Flick, despite Flick's direct involvement in the circumstances which gave rise to Count 17, which is based on an email transmitted from Sparks to Flick a few days after Sparks left LBI.

Flick was interviewed for at least four hours on the night before his 2016 grand jury testimony, during which interview he was shown dozens of documents and emails, the details of which he was unable to recall during a defense interview for the vast majority of documents shown to him.  Per the few pages of notes that the Court ordered the prosecution to turn over during trial, *Exhibit 5*, Flick provided the prosecution team with an overwhelming amount of information favorable to Sparks, including the following:

- Dr. Deitz would have given Flick a recommendation if he asked;

- Legnos is "unhinged" and often yelled

- Legnos "oftentimes … didn't do what he was supposed to do"

- Dr. Deitz wanted an employee of LBI, Metron, and CRA to receive training on the Remus glider (whereas Legnos testified … ..

- Carderock, not LBI, designed the motor controller for the LDUUV

- While Sparks had "designed first electric boards," Flick had been "fixing them"

- Flick, not Sparks, "wrote software for battery to talk to battery controllers & code on the controller"

- Flick "was programming PICS for the battery box"

- Flick "had to fix design of [Pic]Kit so [he] could program the PIC"

- The battery box required three or four boards, not just the one Sparks emailed on December 7, 2011;

- Flick had initiated contact with Sparks on December 7, 2011 because it was the "path of least resistance"

- Flick asked for Sparks' help because "we needed to solve a problem;" and

- Flick saw LBI SolidWorks files on ViewNet.

*Exhibit 5*.

Flick also told the interviewers that Mark Spencer, who AUSA Rodriguez-Coss had accused of stealing LBI's AXIB Buoy trade secrets to start a buoy business with Sparks and Williams, worked with "cube satellites – not buoys." *Id*. Although the reference is not 100% clear, it seems that Flick may have put to bed any notions that Spencer stole AXIB Buoy trade secrets and founded a buoy business based thereon.

Despite all this exculpatory information, the prosecution withheld all notes and information generated from the four (4) hour Flick interview until ordered to produce the notes. Given the circumstances, the defense must be permitted to question Mehring, Stroh, and possibly others who were present for the pre-grand jury interview.

In addition, until the belated disclosure of agent notes, the prosecution planned to question Flick about an innocuous email which the prosecution team believed, or wanted the jury to believe, to be evidence of some type of criminal code.  On the morning of Flick's testimony, the prosecution team provided the defense with exhibits they planned to use during his direct. One of those planned exhibits – which, notably, had not been previously disclosed as an exhibit – is an email from Sparks to John Housten of CRA, Flick, and Williams.  The subject line states: "Angry Faction Has Been Formed." In its entirety, the email states:

> John, this is of utmost importance. An alliance has been formed between the
> blacksmith and the magician. I'm afraid none of the work you have tasked
> me with cannot be accomplished without The One Goggle Case.  There is an

uprising in the works and I fear the worst.

I hope this message finds you quickly. I know the journey will be long and arduous, perhaps thou shalt mount thy mighty FedEx dragon at once in order to appease the serfs.

/s/ Dylan of Dumpster

*Exhibit 11.*

AUSA Rodriguez-Coss, however, apparently abandoned her plan to offer this plainly joking email after the Court ordered her to produce the notes of Flick's first interview, which contain the notation: "emails from DS re: serfs not code for anything." *Exhibit 8.* Of course, but for the notes, the defense would have had no way of knowing that Flick had denied the use of any purported criminal code.

11. **Discovery Violation Regarding Peter Legnos**

During Legnos's direct testimony, AUSA Rodriguez-Coss elicited testimony and evidence about equipment designed and sold to the Navy for use in dolphin-assisted mine hunting. In her rebuttal argument, AUSA Rodriguez-Coss explicitly referenced these sales – which occurred years before Sparks or Williams went to work for LBI – and argued that they satisfy the jurisdictional element of 18 U.S.C. § 1832, at least as to the password-protected Quickbooks file found on Sparks' external device. The prosecution, however, did not disclose this evidence, in violation of Fed.R.Crim.P.16 and the Standing Order on Discovery.

**B. The Defense Should Be Permitted to Question DCIS S/A Christoper Mehring and FBI S/A Greg Stroh.**

At this time, the defense seeks to examine two witnesses: FBI S/A Greg Stroh and DCIS S/A Christopher Mehring, each of whom was present for all or nearly all witness interviews

undertaken in connection with this case.  The Court has already determined that the defense must be given the opportunity to continue their examination of **Mehring**, who was a critical prosecution witness.  The prosecution did not, however, call Stroh, who was present in the courtroom every or nearly every day of the trial.  The defense seeks to call **Stroh** for at least two reasons:

*First*, despite Stroh's presence at every or nearly every witness interview, the prosecution produced only two FBI 302 reports: Lohr's, and a one-paragraph report produced during trial.  In the defense's experience, FBI agents are required to produce 302 reports after **all** witness interviews. As such, the defense has good cause to believe that the prosecution team has intentionally withheld possibly dozens of reports by Stroh and possibly other agents, and they should be permitted to explore this probability by questioning Stroh.

*Second*, Stroh is directly involved in efforts to contact at least one witness for whom no report was provided.  On July 6, 2018, after the Court found Sparks and Williams made a *prima facie* showing of *Brady, Giglio*, and discovery violations, the defense sent a letter to the three prosecutors of record in this case, seeking "a copy of all handwritten notes, memoranda, or interview reports from both DCIS and the FBI," for nineteen witnesses and proposed witnesses. *Exhibit 11*.  <u>**Within two to three hours, FBI S/A Stroh and AUSA Jacabed Rodriguez-Coss called at least one witness on the defense list,**</u> Allen Flick.  That same day, Mr. Flick relayed to the defense that AUSA Rodriguez-Coss asked (1) whether he had "cooperated" with Sparks' lead counsel and (2) whether he had spoken to counsel about the same topics the prosecution had addressed in their three to four interviews.

It is unknown at this time whether they contacted any of the other eighteen (18) people identified in the defense letter.  It is also unknown whether there was a *legitimate* purpose for the

call(s), but the circumstances strongly suggest that a detailed inquiry of Stroh (and, possibly, Rodriguez-Coss) is necessary.

### C. The Court Should Order the Prosecution to Produce Notes and Reports of <u>All</u> Interviews Conducted During the Investigation of this Case.

Through the day of filing, the defense has three sets of agent notes: three and one-half (3.5) pages of agent notes from the initial, surprise interview at the home of Richard Buser that AUSA Rodriguez-Coss mischaracterized as "trial preparation"; eight (8) pages of notes from the four (4) hour pre-grand jury interview of Allen Flick; and two (2) pages of Mehring's notes from a telephone call to Williams.   The Flick and Buser notes, as discussed *supra*, provide convincing evidence of multiple *Brady/Giglio* violations. Based on those many demonstrated violations, there is good reason to believe that additional interview notes and interview reports will uncover even more prejudicial violations.

Since the Court has already rejected the prosecution's request for *in camera* review of Mehring's notes in light of the *prima facie* showing made during trial, *Exhibit 12*, the defense submits that all notes -- whether taken by Mehring, Stroh, prosecutors, or any other federal law enforcement personnel -- of all interviews conducted over the course of the six (6) year investigation be turned over, as well as all interview reports which have not yet been disclosed.

28

**CONCLUSION**

Wherefore, Defendants Jared Dylan Sparks and Jay Williams respectfully request that the Court order the prosecution to produce, **forthwith,** the following discovery:

(1)     All agent notes of interviews of Jay Williams;

(2)     All agent notes of interviews of Jared Dylan Sparks;

(3)     All agent notes regarding interviews conducted during the investigation of this case or, at a minimum, all agent notes regarding interviews conducted by every person disclosed as a potential government witness;

(4)     All interview reports generated during the investigation of this case by any federal law enforcement agent or, at a minimum, all interview reports generated from interviews of every prosecution and defense witness who testified at trial;

(5)     All documents which contain information favorable to the defense and which have not been previously disclosed;

(6)     All prosecutor notes which contain information favorable to the defense;

(7)     All agent of each witness who testified at trial;

(8)     All email communications between Agents Mehring and/or Stroh and witnesses, potential witnesses, and persons with information related to LBI, Inc. and/or the allegations against Sparks and/or Williams;

(9)     All information, documents, emails, and other communications provided to any member(s) of the prosecution team by David Mittelman, Richard Buser, and all other persons who testified at trial or who was listed on any party's witness list;

(10)     All information, documents, reports, notes, memoranda, emails, and any other source of information regarding fraud or allegations of fraud or other criminal conduct by Peter Legnos, LBI, Inc., and LBI employees, past and present;

(11)     All information, documents, reports, notes, memoranda, emails, and any other source of information regarding a purported buoy business founded or run by Mark Spencer;

(12)    All information, documents, reports, notes, memoranda, emails, and any other source of information regarding any witness or potential witness in this case since June 6, 2018; and

(13)    A privilege log regarding any materials not provided due to a claim or privilege.

DATED: July 24, 2018

                                        Respectfully submitted,

                                        **JARED DYLAN SPARKS**
                                        By and through counsel,
                                        */s/ Patricia A. DeJuneas*
                                        Patricia A. DeJuneas #92542
                                        Ashley P. Allen*
                                        Sibbison & DeJuneas
                                        One Commercial Wharf West
                                        Boston, MA 02110
                                        (617) 529-8300
                                        dejuneas@sdappeals.com
                                        *Of counsel*

                                        **JAY WILLIAMS**
                                        By and through counsel,
                                        */s/ Paul V. Kelly*
                                        Paul V. Kelly (phv08622)
                                        Sarah W. Walsh (phv08712)
                                        Jackson Lewis P.C.
                                        75 Park Plaza
                                        Boston, MA 02116
                                        (617) 367-0025
                                        Paul.kelly@jacksonlewis.com
                                        Sarah.walsh@jacksonlewis.com

## CERTIFICATION OF SERVICE

I hereby certify that on July 24, 2018, a copy of the foregoing was filed electronically. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing. Parties may access this filing through the Court's system.

                                        */s/ Patricia A. DeJuneas*
                                        Patricia A. DeJuneas